## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Erik A. Ahlgren, in his capacity as assignee in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company, | **Civil No. 19-00305 (JRT/LIB)** |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| Jay Link and Link's Wild Safaris, | |
| Defendants. | |

Plaintiff Erik A. Ahlgren, in his capacity as assignee ("Plaintiff" or "Assignee") in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company ("Co-Op") submits this Memorandum in opposition to the Motion of Defendants Jay Link ("Link") and Link's Wild Safaris ("Link's Safaris") (collectively "Defendants") to dismiss Plaintiff's claims for lack of personal jurisdiction and alleged pleading deficiencies. As detailed below, Defendants' contacts with Minnesota are so extensive that there can be no real question they are subject to the jurisdiction of the Minnesota courts. Furthermore, Plaintiff has adequately pleaded all of the claims in its Complaint. Defendants' Motion to Dismiss should be denied.

## FACTUAL BACKGROUND

### I.    THE FRAUDULENT SCHEME

The Ashby Farmers Co-Operative Elevator Company (the "Co-Op") is a cooperative formed under Minnesota Statute § 308A with its principal place of business in Ashby, Minnesota. (Complaint, ¶ 1; Declaration of Erik Ahlgren, dated March 17, 2019 ("Ahlgren Dec.," Ex. R, p. 1 (Assignment)).) The Co-Op began operating the grain elevator in Ashby in 1937. (Complaint, ¶ 12.)  It was in the business of buying and selling grains. (Ahlgren Dec., Ex. R, p. 1.)

Jerome Robert Hennessey ("Hennessey") was the manager of the Co-Op. (Ahlgren Dec., ¶ 14 & Ex. O, p. 2 (Plea Agreement).) His responsibilities included overseeing the day-to-day activities of the Co-Op, controlling the bank accounts that held Co-Op funds, and obtaining loans to support the Co-Op's operations. (*Id.*)

Beginning in 2003 or earlier and continuing through approximately September 2018, Hennessey "knowingly and intentionally devised and executed a scheme to defraud and to obtain money and property from . . . the Co-Op . . . and its member farmers by means of materially false and fraudulent pretenses, and promises and concealment of material facts." (*Id.*, Ex. O, ¶ 2.) Using his position and control over the Co-Op's bank accounts, Hennessey wrote checks to himself and to third parties for his own personal benefit. (*Id.*, p. 2.)  The unauthorized checks clearly identified the Co-Op as the payor. (Complaint, ¶ 18.) Hennessey concealed the checks from the Co-Op by coding them as purchases of soybeans, wheat, corn, feed or other ordinary

expenses of the Co-Op. (*Id.*, ¶ 16.) The Co-Op never authorized Hennessey to use its funds for personal purposes. (Ahlgren Dec., Ex. O, p. 2; Complaint, ¶ 17.) To ensure that the Co-Op's bank accounts had sufficient funds to cover its legitimate expenses and to cover the millions of dollars that Hennessey had used for his personal purposes, he obtained a line of credit for the Co-Op exceeding $7 million. (Ahlgren Dec., Ex. O, pp. 2-3.)

As a result of Hennessey's fraudulent scheme, "the Co-Op is now defunct." (Complaint, ¶ 13.)  "On Friday, September 14, [2018] the [Co-Op] officially closed for business after discovering a significant amount of missing grain inventory and more than $2 million in unauthorized expenditures" by Hennessey. (Ahlgren Dec., Ex. R, p. 1.) The Co-Op subsequently discovered more than $5.4 million in unauthorized checks. (*Id.*) The Co-Op "is indebted to creditors and unable to pay debts as they come due." (*Id.*) The Assignment filed with the Court lists forty-three creditors, thirty-five of which were from Minnesota. (*Id.*, Schedule B, pp. 8-9.)  They include $242,029 to the CHS Member Cooperatives Pension Plan, $332,566.60 to a local seed provider, and more than $8 million to CoBank, ACB. (*Id.*)

Hennessey admitted to using more than $5 million dollars that belonged to the Co-Op for his own personal benefit. (Ahlgren Dec., Ex. O, pp. 3, 12.) He agreed to plead guilty to mail fraud and income tax evasion and consented to a money judgment forfeiture in the amount of $5,338,922.21. (*Id.,* pp. 1, 12.)

## II.    FRAUDULENT PURCHASES FROM DEFENDANTS

Among other things, Hennessey fraudulently used Co-Op funds to pay for

expensive hunting trips from Defendants. (Complaint, ¶ 17; *see* Ahlgren Dec., Ex. O, p. 2.) As set forth in the Complaint, the Co-Op identified ten checks written out to Link over the period of October 30, 2015 to February 18, 2018. (Complaint, ¶ 17.) The unauthorized checks from the Co-Op's account to Link are as follows:

| Payee | Check # | Date Entered in Co-Op Accounting System | Amount |
|---|---|---|---|
| Jay Link | 2025485 | 02/18/18 | $24,000.00 |
| Jay Link | 2025518 | 02/18/18 | $05,500.00 |
| Jay Link | 2024566 | 12/29/17 | $25,100.00 |
| Jay Link | 2024796 | 12/29/17 | $40,800.00 |
| Jay Link | 2024902 | 12/29/17 | $73,750.00 |
| Jay Link | 2023744 | 12/30/16 | $44,500.00 |
| Jay Link | 2023805 | 12/30/16 | $10,000.00 |
| Jay Link | 2023897 | 12/30/16 | $50,000.00 |
| Jay Link | 2022470 | 12/31/15 | $20,000.00 |
| Jay Link | 2022874 | 10/30/15 | $18,500.00 |
| | | **TOTAL** | **$312,150.00** |

(Complaint, ¶ 17.) These unauthorized checks identified the Co-Op as the payor. (*Id.*, ¶ 18.) Based on the name of the Co-Op, Defendants knew or should have known that they were taking checks from an agricultural cooperative for expenses unrelated to the business of said Co-Op. (*Id.*, ¶ 19.)

Based on the Link Declaration, dated February 27, 2019 ("Link Dec."), the 2015 transaction involved a hunting trip to Uganda, the 2016 and 2017 transactions involved two hunts in Camaroon, and the 2018 transaction involved a hunt in Nepal. (Link Dec., ¶¶ 6-9.) Upon information and belief, in connection with each of these

four trips, Defendants corresponded with Hennessey and/or his wife Rebecca, obtained travel information from them, assisted in obtaining permits and other required government approvals, all of which allowed Defendants to understand that they were soliciting business from residents of the State of Minnesota. (Complaint, ¶ 21.)  Written communications between Defendants and Hennessey in Ashby, Minnesota in connection with these trips clearly show that Defendants knew they were dealing with a Minnesota resident. (*See* Ahlgren Dec., Ex. U.)

## LEGAL ARGUMENT

### I.  MOTION TO DISMISS – LACK OF PERSONAL JURISDICTION

#### A. Standard of Review

This Court can exercise jurisdiction over a nonresident defendant if the requirements of Minnesota's long-arm statute are met, and the exercise of jurisdiction comports with due process. *See, e.g., Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011) (*citing Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996)). The Minnesota Supreme Court has interpreted the state's long-arm statute to "extend the personal jurisdiction of Minnesota courts as far as the Due Process Clause . . . allows." *Valspar Corp. v. Lukken Color Corp.,* 495 N.W.2d 408, 410 (Minn. 1992). Thus, the two-part inquiry collapses into the single question of whether jurisdiction complies with due process requirements. *See, e.g., Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2005), *cert. denied*, 549 U.S. 883 (2006); *Red Wing Shoe Co. v. Hockerson-Halbertstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir.1998).

Due process requires Defendants to have "certain minimum contacts" with the

forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington,* 326 U.S. 310, 316 (1945) (*quoting Miliken v. Meyer,* 311 U.S. 457, 463 (1940)).  The test is not "mechanical or quantitative," but rather depends upon "the relationship among the defendant, the forum, and the litigation." *Id.* at 319.  Sufficient minimum contacts exist if a defendant's "conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

Contacts that are random, fortuitous, attenuated, or the result of "unilateral activity of another party or a third person" do not support personal jurisdiction." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985).  There must be some act by which a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253 (1958). However, "[t]he defendant's activity need not have taken place within the forum, . . . and a single transaction with the forum will suffice." *In re Bernard L. Madoff Investment Sec. LLC,* 418 B.R. 75, 80 (S.D.N.Y. 2009) (citing *Burger King,* 471 U.S. at 476 and *McGee v. International Life Ins.,* 355 U.S. 220, 223 (1957)).

Personal jurisdiction may be either "general" or "specific." *See Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 134 S. Ct. 746, 754 (2014)). General jurisdiction provides jurisdiction over "any and all claims" against a defendant because the "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the

6

forum State." *Id.* (*quoting Daimler*, 134 S.Ct. at 754). Specific jurisdiction, on the other hand, "'requires that the cause of action arise from or relate to a defendant's actions within the forum state.'" *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010).

The Court must view all facts in the light most favorable to the plaintiff and resolve all factual disputes in the plaintiff's favor. *Janel Russell Designs, Inc. v. Mendelson & Assocs., Inc.,* 114 F. Supp. 2d 856, 861 (D. Minn. 2000). The essential question is whether the exercise of personal jurisdiction is "reasonable" and "fair." *International Shoe,* 326 U.S. at 320. "[I]nconvenience alone is not a violation of due process." *Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137, 1145 (1975). "[M]odern transportation and communication have made it much less burdensome for a party to defend himself in a State where he engages in economic activity." *McGee,* 355 U.S. at 223.

As discussed below, Defendants' known contacts with the forum State are so substantial that one or both may be subject to general jurisdiction in Minnesota. However, general jurisdiction need not be addressed because the requirements of specific jurisdiction are clearly satisfied.

### B.  <u>The Exercise of Jurisdiction Over Defendants Comports with Due Process.</u>

The Eighth Circuit looks at five factors to evaluate minimum contacts:  1) the nature and quality of contacts with the forum state; 2) the quantity of contacts; 3) the relationship between the contacts and cause of action; 4) the interest of the forum state; and 5) the convenience of the parties. *See, e.g., Aftanase v. Economy Baler Co.,* 343 F.2d

187, 195-197 (8th Cir. 1965).  Courts place greater emphasis on the first three factors.

*E.g., Datalink Corp. v. Perkins Eastman Architects, P.C.*, 33 F. Supp. 3d 1068, 1072 (D.

Minn. 2014); *Janel Russell Designs,* 114 F. Supp. 2d at 861. Because the first three

factors overlap, they can be considered together.

In his Declaration, Link attempts to minimize Defendants' contacts with

Minnesota. However, as outlined below, Defendants have extensive Minnesota contacts.

The quality, quantity and relatedness of Defendants' contacts to the cause of action leave

no doubt that it is fair and reasonable to exercise personal jurisdiction over them in

Minnesota.

As an initial matter, Link advised the Court that: "I live and am domiciled in the

State of Wisconsin." (Link Dec., ¶ 2.) Link failed to mention that he lives in Superior,

Wisconsin, only 7.4 miles from Duluth, Minnesota. (Ahlgren Dec., ¶ 3 & Exs. B & C.)

Link also minimizes his connection with a "Mankato-operated business" he

admittedly had an ownership interest in, characterizing it as "indirect." (Link Dec., ¶ 4.)

Link fails to mention that he was also the Chief Executive Officer of this company -

Jerky Snack Brands, Inc. ("Jerky Snack"). (Ahlgren Dec., Ex. D, p. 4.) At the time Link

was CEO, Jerky Snack's production facilities were in Mankato, Minnesota, and its "only

products . . . [were] packaged, shipped, and paid for in the Mankato, Minnesota facility."

(*Id.*, pp. 4-5.) Thus, not only did Link have an ownership interest in a business

conducting operations in Minnesota, he was the CEO of that Minnesota-operated

company.

Link also minimizes his contacts with Hennessey, stating that they met and talked about the hunts at conventions of the Safari Club International ("Safari Club" or "SCI") in Nevada. In fact, Hennessey - a Minnesota resident - had provided Defendants with a lucrative continuing business opportunity - receiving ten checks totaling in excess of $300,000 over a span of more than two years.  (Complaint, ¶ 17.)  The unauthorized checks identified the Co-Op, a Minnesota entity, as the payor. (*Id.*, ¶ 18.)

The money was used for four different exotic and very expensive hunting trips by Hennessey (and on at least one occasion, his wife also) to Africa and South Asia – in 2015, 2016, 2017 and 2018. (Link Dec., ¶¶ 6-9.) Unquestionably, each of these hunts required planning and coordination. In connection with each of these four trips, Defendants necessarily communicated with Hennessey and/or his wife to obtain travel information and assist in obtaining permits and other required government approvals, all of which allowed Defendants to understand that they were soliciting business from residents of the State of Minnesota. (*See* Complaint, ¶ 21.) Written communications between Defendants and Hennessey in Ashby, Minnesota in connection with these trips show that Defendants knew they were dealing with a Minnesota resident. (*See* Ahlgren Dec., Ex. U.)  In addition, in 2015, Defendants arranged a hunt for Hennessey with an outfitter located in Minnesota. (*Id.*, Ex. V.)

Defendants make no mention of their extensive involvement with the Safari Club generally and in Minnesota. SCI is a "Global Hunting" organization. (Ahlgren Aff., ¶ 5 & Ex. E.) Link has "been a member since 1988, active in many facets regionally, domestically, & internationally.. [sic] [He] [s]erved on many committees, held various

9

leadership positions & . . . promote[s] SCI and it's [sic] mission!" (*Id.*) Link was its Vice President from 2012-2014.  (*Id.*)

Link "liked" the Minnesota SCI organization on Facebook and indicated that he was "going" to the 44th Annual Minnesota SCI World Hunting Expo & Banquet less than one month ago on February 22-23, 2019 in Brooklyn Park, Minnesota. (*See* Ahlgren Dec., ¶ 6 & Ex. F.)

Link Safaris is a regular exhibitor at Minnesota SCI hunting events in Minnesota. In fact, Link Safaris was an exhibitor at the Minnesota SCI World Hunting Expo in Brooklyn Park just last month. (Ahlgren Dec., ¶ 7 & Ex. G.)  Link Safaris was also an exhibitor the prior two years. (*Id.*)  In all likelihood, Link Safaris was an exhibitor in other years as well, but information regarding those events is no longer available on the SCI website. On February 26, 2019, following the 2019 Expo in Brooklyn Park, Minnesota SCI thanked its exhibitors, including Link Safaris.  (Ahlgren Dec., ¶ 9 & Ex. I.)

Link Safaris also donates hunting trips to Minnesota SCI events in Minnesota.  In fact, on February 11, 2019, Minnesota SCI posted on Facebook that Link's Safaris had donated a hunt for the upcoming Expo. (Ahlgren Dec., ¶ 9 & Ex. I.). Link Safaris similarly donated a hunting trip at the Minnesota SCI 42nd Annual World Hunting Expo in February 2017, in Bloomington, Minnesota. (Ahlgren Dec., ¶ 8 & Ex. H.).

In January 2019, Minnesota SCI congratulated Jay Link on his award of SCI International Hunter of the Year, further evidencing his close connection with the organization. (Ahlgren Dec., ¶ 9 & Ex. I.).  Link Safaris shows up as a "related page" on

the Minnesota SCI Facebook page, advertising that is unquestionably targeted at Minnesotans. (*See id.*)

In addition, Link was "the founder of the SCI Lake Superior Chapter," which regularly has fundraisers in Minnesota. (Ahlgren Dec., ¶ 10 & Exs. J & K.) Link indicated his intent to attend a number of those Minnesota fundraisers, including in 2018, 2017 and 2016. (Ahlgren Dec. ¶ 10 & Ex. K.)

Link also indicated he was going to attend the upcoming 40th Banquet and Fundraiser for the Wild Sheep Foundation – Midwest Chapter on March 15–16, 2019 in Minnetonka, Minnesota. (Ahlgren Dec., ¶ 11 & Ex. L.)

Link Safari has a website offering various hunting and fishing excursions to individuals around the world, including Minnesota. Defendants claim that the Link Safaris's website does not offer "a single hunting or fishing destination . . . in Minnesota." (Link Dec., ¶ 9.)  However, one of those offered destinations is a "Lake of the Woods Fishing" trip, which as shown on Defendants' own map, is partly in Minnesota. (Ahlgren Dec., ¶ 12 & Ex. M.)  Link also uses Facebook to generate hunting business outside of Wisconsin. (*See* Ahlgren Dec., ¶ 19, Ex. S.)

Link "likes" other Minnesota hunting organizations as well, including the Minnesota Outdoor Adventure Foundation - a charity organization in Lakeville, Minnesota - and the Minnesota Deer Hunters Association - a nonprofit organization in Grand Rapids, Minnesota. (Ahlgren Dec., ¶ 13 & Ex. N.)

One way of invoking the "benefits and protections" of a State's laws is to engage in "voluntary, affirmative economic activity of substance."  *Aftanase*, 343 F.2d at 197

(Defendant who actively sought sales and accepted continuing orders "reasonably could have anticipated that this activity would have consequences in the state."). There can be no question that Defendants engaged in such activity with regard to Minnesota. In sum, Defendant Link lives 7.4 miles from Duluth, Minnesota, regularly comes to Minnesota for hunting-related events, founded an organization that regularly holds hunting fundraisers in Minnesota, and owned and was CEO of a Minnesota-operated business. Defendant Link Safaris regularly exhibits at hunting events in Minnesota (including as recently as last month), donates hunts to hunting-related events in Minnesota (including just last month), arranged a hunt for Hennessey using a Minnesota outfitter and directs advertising at Minnesota residents. Defendants were happy to cash more than $300,000 in checks written on the Co-Op's account, from 2015 to 2018 for multiple exotic hunting excursions, which checks showed the Co-Op as being based in Minnesota. Defendants discuss, but do not dispute having corresponded with Hennessey and/or his wife regarding these four trips as alleged in Paragraph 21 of the Complaint. (*See* Def. Mem., pp. 10-11; *see* Ahlgren Dec., Ex. U.)

Discovery would no doubt provide more details regarding Defendants' contacts with Minnesota in connection with Hennessey's trips and would likely show additional Minnesota contacts, including other financial benefits from Minnesota residents. However, given the significant number of high-quality hunting-related contacts directed at Minnesota, the Assignee does not believe that it is necessary to spend money to obtain more of Defendants' Minnesota contacts. The first three prongs of the Eighth Circuit's five-part test are clearly satisfied.

The two less important factors also weigh strongly in favor of jurisdiction. Defendants argue that the Assignee cannot claim Minnesota citizenship because the Complaint does "not plead the citizenship of any creditor." (Def. Mem., p. 6 n.1.) Defendants cite no authority to support their argument that jurisdiction of an assignee is determined by its creditors' citizenship. (*Id.*)  Defendants based their removal to federal court on the Assignee being a citizen of Minnesota. (Ahlgren Dec., Ex, A, ¶ 24.) Defendants averred that the Assignee is a citizen of Minnesota, and the Co-Op is a Minnesota cooperative with its principal place of business in Minnesota. (Ahlgren Dec., Ex. A, ¶¶ 15, 17-20.) Defendants cannot have it both ways.

However, even if the creditors' citizenship is the determining factor, the vast majority of the Co-Op's creditors are from Minnesota. The Assignment for the Benefit of Creditors - filed in Minnesota State Court pursuant to Minn. Stat. § 577 - lists all known creditors of the Co-Op and shows that thirty-five of the forty-three known creditors (more than 80%) are Minnesota based.[1] (Ahlgren Dec., Ex. R, Sched. B.) Minnesota undoubtedly has an interest in providing a forum for its citizens, the Assignee and its creditors.  "[O]ften the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Creative Calling Solutions, Inc. v. LF Beauty Ltd.,* 799 F.3d 975, 982 (8th Cir. 2015) (*quoting Asahi Metal Indus. Co., Ltd v. Superior Ct.,* 480 U.S. 102, 113 (1987).) Here, there is

---

[1] As Defendants note, "matters of public record" may be considered "when conducting a dismissal analysis." (Def. Mem., p. 9 n.3.)  As stated in *Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007), one of the cases relied upon by Defendants, "court records are public records."

minimal, if any, burden on Defendants.

As outlined above, Defendant Link, who is the sole owner and controls the corporate Defendant, lives in Superior, WI, which is 7.4 miles from the Minnesota town of Duluth and regularly travels to Minnesota in connection with his hunting business. Defendants' opposition to jurisdiction appears to be nothing more than a strategic maneuver to avoid litigating in the Co-Op's home state. The Assignee's records are in Minnesota as are its primary witnesses. (Ahlgren Dec., ¶ 15.) Thus, the convenience factor also weighs in favor of Minnesota. The Court should find that both Defendants have sufficient contacts to warrant the extension of personal jurisdiction over them.[2]

## II.   <u>MOTION TO DISMISS – FAILURE TO STATE A CLAIM</u>

### A. <u>Standard of Review</u>

Defendants rely on *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 545 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) to argue that the Assignee's Complaint is insufficiently pleaded, and thus the Assignee's claims should be dismissed. (Def. Mem., p. 12.)  However, pleading is not supposed to be a game of "Gotcha."  "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to

---

[2] While the Assignee believes that Defendants' Minnesota contacts satisfy due process, should the Court disagree, Plaintiff requests permission to conduct jurisdictional discovery of Defendants.  *See, e.g., Pudlowski v. St. Louis Rams, LLC,* 829 F.3d 963, 964 (8th Cir. 2016) ("[W]here issues arise as to jurisdiction . . ., discovery is available to ascertain the facts bearing on such issues.") (*quoting Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n. 13 (1978)); *Federal Ins. v. Steris Corp.,* No. 11-cv-000078 (SRN/AJB) (D. Minn. 2012) (court allowed "limited discovery related to personal jurisdiction") (Ahlgren Dec., Ex. T).

facilitate a proper decision on the merits." *Genz-Ryan Plumbing & Heating Co. v. Sheet Metal Workers' Local 10,* 207 F. Supp. 1038, 1045 (D. Minn. 2016) (*quoting Edelman v. Belco Title & Escrow, LLC,* 754 F.3d 389, 395 (7th Cir. 2014)) (*quoting Conley v. Gibson,* 355 U.S. 41, 48 (1957), *abrogated on other grounds by Twombly,* 550 U.S. at 562-63).)

In deciding a Rule 12(b)(6) motion, the Court must view the complaint "in the light most favorable to the nonmoving party." *Lonaker v. Bos. Sci. Corp.,* 872 F. Supp. 2d 816, 819 (D. Minn. 2012). Claims are to be construed liberally. *Twombly,* 550 U.S. at 554-56. Here, there is ample evidence of the Defendant's liability, but the applicable standard, as noted by Defendants, is whether the claim is "facially plausible." (Def. Mem., p. 12.)  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable . . .." *Iqbal,* 556 U.S. at 678.  Plausibility is assessed by "drawing on . . . judicial experience and common sense." *Id.* at 679. Courts are to "review the plausibility of plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Grp.,* 592 F.3d 893, 896 n.4 (8th Cir. 2010). As set forth below, the Assignee's claims clearly meet the plausibility standard.

**B.** **Defendants' Motion to Dismiss the Fraudulent Transfer Claims Should be Denied.**

    1.   **The Assignee Has Adequately Pleaded its Actual Fraud Claim under the Minnesota Uniform Voidable Transactions Act ("MUVTA"), § 513.44.**

As this Court stated in *S.E.C. v. Brown,* 643 F. Supp.2d 1077 (D. Minn. 2009)*,* establishing a claim for actual fraud under Minn. Stat. § 513.44(a)(1) requires the Assignee to plead that the transfer of funds to Defendants was made with "'actual intent' to hinder, delay, or defraud" the Co-Op. *Id.* at 1081. Actual intent to defraud is "rarely susceptible of direct proof," *Cedar Rapids Lodge & Suites v Seibert,* No. 14-CV – 04839 (SRN/KMM), 2018 WL 747408, at *12 (D. Minn. Feb. 7, 2018), but this is one of those rare cases.

Here, Hennessey, in his plea agreement stated that he "knowingly and intentionally devised and executed a scheme to defraud and to obtain money and property from the [Co-Op] and its member farmers by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts . . . to pay for, among other things . . . expensive hunting trips . . .." (Ahlgren Dec., Ex. O, pp. 1-2.) While the Co-Op itself did not have fraudulent intent, Minn. Stat. § 513.44(a)(1) has been interpreted broadly and is intended to apply to transfers through an entity when an officer or director uses the entity as an instrumentality of fraud. *Reilly v. Antonello*, 852 N.W.2d 694, 701 (Minn. Ct. App. 2014) ("To allow a sole director, officer, and shareholder to mask his fraudulent actions behind the façade of a closely held corporation would defy the plain meaning and intent of the Minnesota Uniform Fraudulent Transfer Act.") (*citing*

Minn. Stat. § 513.44 and *New Horizon Enters., Inc. v. Contemporary Closet Design, Inc.,* 570 N.W.2d 12 at 14, 16 (Minn. Ct. App. 1997)); *see also In re Sholdan,* 217 F.3d 1006, 1010 (8th Cir. 2000) (under MUFTA, the court is "free to consider any . . . factors bearing upon the issue of fraudulent intent."). "[T]he fraudulent conveyance act is remedial and as such should be liberally construed." *Lind v. O.N. Johnson Co.,* 282 N.W. 661, 667 (Minn. 1938).

This Court's decision in *Brown* (relied on by Defendants) provides a roadmap to follow in this case. In *Brown,* the lawsuit was brought by a receiver alleging that:

> [f]rom November 2004 through January 2006, Brown transferred funds from the Brawta U.S. Bank Account to the Relief Defendant . . .. The Receiver further alleges that . . . the Relief Defendant received approximately $69,775.88 of the Brawta investor funds . . . for . . . personal obligations of Brown. Brawta did not owe Relief Defendant money for any obligations of Brawta. . . . [P]ayments came directly from the Brawta investors, and the Relief Defendant was not entitled to receive the funds.

*Brown,* 643 F. Supp.2d at 1080-81 (quotations omitted). The allegations in the instant case are nearly identical.  Here the Assignee alleges that from October 2015 to February 2018, Hennessey transferred funds from the Co-Op's bank account to Defendants. Defendants received $312,150 of Co-Op funds for personal obligations of Hennessey. The Co-Op did not owe Defendants money for any obligations of the Co-Op. Payments came directly from the Co-Op, and the Defendants were not entitled to receive the funds. (*See* Complaint, ¶¶ 16-19).

This Court found that the receiver in *Brown* had "properly stated a fraudulent transfer claim by alleging the 'who, what, when, where, and how' of the claimed fraudulent transfer."  *Brown,* 643 F. Supp. at 1081.  Specifically, the receiver alleged that

the defendant "received Brawta investor funds as payment for Brown's personal obligations and that those payments originated from a Brawta bank account and were sent to [defendant]." *Id.*  Likewise, in the instant case, the Assignee alleged that the Defendants received Co-Op funds as payment for Hennessey's personal obligations and that those payments originated from a Co-Op bank account and were sent to Defendants. It does not matter that the underlying obligation was lawful. *Id.* at 1082.  Under Minn. Stat. § 513.44(a)(1), it suffices to allege that payments were made by removing another party's funds in furtherance of a fraud on that party. *Id.*  Hennessey's Plea Agreement in the criminal action (Ahlgren Dec., Ex. O) substantiates the Assignee's allegation of intentional fraud. *See United States ex. rel Thayer v. Planned Parenthood of the Heartland,* 765 F.3d 914, 917-18 (8th Cir. 2014) ("reliable indicia" of fraud can be used to satisfy Rule 9(b)'s requirements); (Def. Mem., p. 9, note 3 (court may consider pleadings and matters of public record).)

Since the Assignor has shown actual intent, there is no need to look at the badges of fraud. However, the Assignee has also adequately pleaded multiple badges. For example, badge three, concealment of the transfer, is clearly satisfied.  Hennessey concealed the transfers from the Co-Op by coding them as ordinary purchases of grain or feed, giving the impression that they were related to legitimate operations of the Co-Op. (Complaint, ¶¶ 16, 24; Ahlgren Dec., Ex. O, p. 2.)

Badge 8 is also present – the value of the consideration received by the Co-Op was not reasonably equivalent to the amount of the obligation incurred. "The Co-Op owed no money and had no contractual relationship" with Defendants and thus, received no value

from the transaction.  (Complaint, ¶ 23.) Yet, it paid a substantial sum exceeding $300,000. (*Id.*, ¶ 17.)  "A payment made *solely* for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor." *In re Whaley,* 229 B.R. 767, 775 (Bankr. D. Minn. 1999); *see also* Uniform Fraudulent Transfer Act § 3, comment 2, 7A U.L.A. 48 (2006) ("consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition of value"); Minn. Stat. § 513.43(a) (value is given if the transfer satisfies an antecedent debt).

Badge 9 is also satisfied. "[T]he Co-Op was insolvent or became insolvent as a result of the transfers." (Complaint, ¶ 37.) "Insolvent" under MUFTA is a defined term, contemplating a "a straightforward meaning:  the 'balance sheet' conception of insolvency, debts vs. assets." *In re Petters,* 495 B.R. 887, 923 (Bankr. D. Minn. 2018). Under MUFTA, "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater the sum of the debtor's assets"; "[a] debtor that is generally not paying the debtor's debts as they become due . . . is presumed to be insolvent." Minn. Stat. § 513.42(a) – (b).

The Co-Op "closed for business" September 2018 "after discovering a significant amount of missing grain inventory and more than $2 million in unauthorized expenditures." (Ahlgren Dec., Ex. R, p. 1 (Assignment.)  The Co-Op subsequently "discovered more than $5.4 million in unauthorized checks" and "is indebted to creditors and unable to pay debts as they become due." (*Id.*)  Under Minn. Stat. § 513.42(b), the Co-Op "is presumed to be insolvent." Thus, "under the governing law, this puts the essence of the [Assignee's] factual contentions on insolvency right up the flagpole; there

was no need to make dollar-specific averments of fact going to the status of the [Co-Op's] balance sheet." *Petters,* 495 B.R. at 923.

"[O]ne of the main purposes of [Rule 9(b)] is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Brown,* 643 F. Supp.2d at 1080. Defendants can easily identify the challenged transfers since the Assignee has pleaded them by date, amount and check number. There can be no question that Defendants have enough information regarding this lawsuit to respond and prepare a defense. Defendants' Motion to Dismiss the Assignee's fraudulent transfer claim should be denied.

## C. <u>The Constructive Fraud Claim is Properly Pleaded.</u>

In *Brown*, once the Court found that the receiver had properly stated a claim for actual fraudulent transfer under subsection (a)(1), it declined to address whether the receiver had stated a claim for constructive fraud under subsection (a)(2).  643 F. Supp.2d at 1080. Likewise, in the instant case, because the Assignee has properly stated a claim under subsection (a)(1), the Court need not determine whether a claim has been stated under subsection (a)(2). However, should the Court decide to review the Assignee's constructive fraud claim, it should find that this claim is also properly pleaded.

The first question is what pleading standard applies to constructive fraud claims under MUVTA, § 513.44.  For the reasons set forth below, the Assignee believes that Fed. R. Civ. P. 8 is the proper standard. Rule 8 requires only that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required; the complaint must only plead facts sufficient "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at

555.

Rule 9(b) applies a heightened standard with respect to fraud, requiring that it be pleaded "with particularity." Defendants argue that the heightened standard applies to all MUVTA claims, including constructive fraud claims, citing *Brown,* 643 F. Supp.2d at 1080. In *Brown,* this Court said it was "undisputed that claims under the MUFTA must comport with Rule 9(b)'s particularity requirements." *Id.* However, the Court did not analyze the two rules or expressly make a choice between them. *See id.*; *see also Petters,* 495 B.R. at 916. And, as previously stated, the Court did not rule on the constructive fraud claims because it found that actual fraud had been properly pleaded.

The *Petters* court noted that "[t]he greater number of published decisions . . . reject Rule 9(b) as inapplicable to the constructive-fraud variant of fraudulent transfer law." 495 B.R. at 916.  The court explained that the reason for the particularity requirement was because of the difficulty of proving traditional fraud. *Id.* at 917. Such concerns do not apply to constructive fraud cases because "the statutory elements go purely to facts of a financial nature." *Id.*; *see also Seibert,* 2018 WL 747408, at *7 ("9(b) standard . . . does not apply to Plaintiffs' constructive fraud claims").  The Assignee asks the Court to adopt the same reasoning as these cases and apply the Rule 8 pleading standard to the constructively-fraudulent transfer claims. However, even if the Court were to apply the heightened pleading standard, it is satisfied by the pleadings in this case.

As Defendants state, "a claim for constructive fraud turns on a creditor's ability to show that the debtor made the transfer without receiving 'reasonably equivalent value,'

and the debtor was insolvent, or the transfer made the debtor insolvent or unable to pay its debts." (Def. Mem., p. 17.) As demonstrated, *supra* pp. 16-17, in addressing the "badges" in the actual fraud claim, the Co-Op did not receive any value from the transfer and was clearly insolvent.[3] Therefore, the Court should find that the Assignee's constructive fraud claim is adequately pleaded and deny Defendants' Motion to Dismiss.

### D. <u>The Unjust Enrichment Claim Should Be Allowed as an Alternative Count.</u>

Defendants argue that the Assignee's unjust enrichment claim should be dismissed because it is based on the "same pleaded facts" as the fraudulent transfer claims. (Def. Mem., p. 19.)  Defendants rely primarily on an unpublished decision by this Court, *Finn v Moyes,* No. 14-CV-1293 (JRT/TNL), 2017 WL 1194192, at *17 (D. Minn. Mar. 30, 2017). However, as noted by the Eighth Circuit Court of Appeals, other "district courts are unwilling to dismiss an unjust enrichment claim at the pleading stage despite the existence of an adequate legal remedy, because the federal rules allow for the pleading of claims in the alternative." *United States v. Bame,* 721 F.3d 1025, 1031 (8th Cir. 2013) (citing *United States v. R.J. Zavoral & Sons Inc.,* 894 F. Supp.2d 1118, 1127 (D. Minn. 2012) and *Marty H. Segelbaum, Inc. v. MW Capital, LLC,* 673 F. Supp. 2d 875, 880 (D.

---

[3] As Defendants point out, the Assignee also alleged that a creditor's claim arose before the checks to Defendants, stating that "[a]t all times material hereto, there was and is at least one or more creditors who held and who hold claims against the Co-Op, including but not limited to CoBank (the 'Predicate Creditors')." (Def. Mem., pp. 17-18; Complaint, ¶ 9.)  The Assignee has provided the Court with public records listing the many creditors of the Co-Op, including a line of credit with CoBank exceeding $7 million. (Ahlgren Dec., Exs. O & R, Sched. B.) UCC financing statements in the public record further demonstrate the existence of Predicate Creditors.  (*Id.*, Ex. T.) The constructive fraud claim satisfies the plausibility standard.

Minn. 2009)). The Eighth Circuit did not criticize those rulings, noting only that "the issue here is not one of pleading," since the *Bame* case was at the summary judgment stage.

Federal Rule of Civil Procedure 8(d)(2)-(3) specifically provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency:

> (d)   Pleading to be Concise and Direct; Alternative Statements; Inconsistency.
>
> (1) *In General.* Each allegation must be simple, concise, and direct. No technical form is required.
> (2) *Alternative Statements of a Claim or Defense.* A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
> (3) *Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency.

Consistent with Rule 8, courts in this district have continued to allow alternative pleading of unjust enrichment. *See, e.g., Bhatta v. 3M Co.,* 323 F. Supp.3d 1082 (D. Minn. 2018) (alternative pleading of unjust enrichment permitted); *De Castro v. Castro,* No. 18-1449 (DWF/ECW) (D. Minn. Nov. 16, 2018) ("While Plaintiffs will be unable to recover under both legal and equitable remedies, they are still entitled to pursue alternative theories at this stage in the litigation.") (Ahlgren Dec., Ex. Q); *Anderson v. Equity Tr. Co.,* No. 18-471 (DWF/LDB) (D. Minn. Sept. 26, 2018) ("unjust-enrichment claims may be pled in the alternative") (Ahlgren Dec., Ex. P). The Assignee requests that this Court follow the rulings in these cases and decline to dismiss the Assignee's unjust enrichment claim at this time.

**E.  If any Pleading Deficiencies Exist, the Assignee Requests Leave to Amend.**

The Assignee believes the Complaint complies with pleading requirements, and Defendants' Motion to Dismiss should be denied. However, should the Court disagree, the Assignee respectfully requests leave to amend. Such leave is to be freely granted where, as here, there has been no "undue delay, bad faith or dilatory motive," nor would the amendment be futile; in addition, given the early stage of this case, Defendants would suffer no prejudice. *Foman v. Davis,* 371 U.S. 178, 182 (1962) ("[i]n the absence of . . . undue delay, bad faith or dilatory motive, . . . undue prejudice, . . . futility of amendment, etc. – the leave sought should . . . be 'freely given.'"); *see* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires"); *Seibert,* 2018 WL 747408, at *6 ("A court abuses its discretion when it denies a motion to amend a complaint unless there exists undue delay, bad faith, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment.") (*quoting Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 497 (8th Cir. 2008).)

## CONCLUSION

Defendants' Motion to Dismiss for lack of personal jurisdiction and failure to adequately plead claims should be denied in their entirety.

**Ahlgren Law Office, PLLC**

Dated: March 19, 2019

*s/Erik A. Ahlgren*_____
Erik A. Ahlgren, Attorney #191814
220 West Washington Ave, Ste 105
Fergus Falls, MN  56537
Office: 218-998-2775

Fax:  218-998-6404
erik@ahlgrenlaw.net